FILED
United States Court of Appeals
Tenth Circuit

April 14, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENET CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ERIC G. EGBERT, SHAUN A. WALKER, and TRAVIS D. MASSEY,

    Defendants-Appellants.

Nos. 07-4180, 07-4182, 07-4283

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:06-CR-406-DB)**

G. Fred Metos of Salt Lake City, Utah, for Defendant-Appellant Egbert.

Ann Marie Taliaferro of Salt Lake City, Utah, for Defendant-Appellant Walker.

Deirdre A. Gorman of Ogden, Utah, for Defendant-Appellant Massey.

Jessie K. Liu, Attorney (Grace Chung Becker, Acting Assistant Attorney General, Civil Rights Division; and Jessica Dunsay Silver and Marie K. McElderry, Attorneys, on the consolidated brief), United States Department of Justice, Washington, D.C., for Plaintiff-Appellee.

Before **KELLY**, **SEYMOUR** and **MURPHY**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

The charges in this case stem from two racially-motivated assaults in Salt Lake City, Utah. Following a jury trial, defendants Eric G. Egbert, Shaun A. Walker, and Travis D. Massey were convicted of conspiracy to interfere with civil rights under 18 U.S.C. § 241 and aiding and abetting the interference with a federally protected activity under 18 U.S.C. § 245(b)(2)(C) and 18 U.S.C. § 2. Defendants raise various challenges to their sentences. We affirm in part and reverse in part.

I.

Defendants were members of the Salt Lake City unit of the National Alliance ("NA"), a white separatist organization. NA members held formal monthly meetings and participated in activities such as distributing flags and sponsoring a ballot initiative. NA members also socialized informally. Mr. Walker served as NA's local unit coordinator and spokesperson until December 2002, when Mr. Massey took over the position following Mr. Walker's acceptance of a job at NA's national office.

Keith Cotter, a member of NA and a convicted felon, was the prosecution's key witness. Cotter testified as part of a plea agreement in a separate federal hate crime case. In exchange for his testimony, he was not charged for the incidents at issue in this case. Cotter testified that a sub-group of NA members discussed the

use of violence against "non-white" individuals.[1]  Mr. Egbert, Mr. Walker, and Mr. Massey participated in these conversations.  According to Cotter, the ultimate goal was to "have an open racial holy war," where non-whites would be thrown "out of the country" and the government would be "run by white people."  Trial Tr. at 277.  Cotter testified that he also had conversations with defendants about the use of violence against non-whites in the Salt Lake City area for the purpose of instilling fear in the non-white community and recruiting like-minded individuals to join the white supremacist movement.  Cotter testified that all three defendants either made such statements or agreed with them.  While they did not make specific plans to assault non-whites, they did talk generally about strategy and agreed that they would act if the opportunity presented itself.

Brad Callahan was another NA member who testified at trial.  His testimony somewhat contradicted Cotter's regarding the extent of the group's agreement to commit violence against non-whites.  He said that while the defendants went along with Cotter's ideas, they did not take him seriously.

On December 31, 2002, Mr. Egbert, Mr. Walker, and Mr. Massey met up with Cotter and several other NA members at O'Shucks bar in Salt Lake City.  Cotter and Mr. Egbert handed out stickers advertising NA.[2]  When Cotter

---

[1]  NA members use the term "non-white" to describe persons who are not of European descent, as well as those who are of Jewish descent.

[2]  The stickers read: "Stop immigration.  Non-whites are turning America
(continued...)

-3-

approached the bartender, Jimmy Ballesteros, and asked him about his heritage, Ballesteros responded that his father was of Mexican descent. Ballesteros then asked Cotter to stop handing out the stickers.

Following complaints from patrons, and as the atmosphere in the bar became increasingly tense, Ballesteros asked the group to leave. When they eventually complied, Ballesteros and another bartender followed them to the door. Cotter punched Ballesteros and pulled him out the door into the vestibule, at which point Mr. Egbert, Mr. Walker, and Mr. Massey joined in, punching and kicking Ballesteros and using racial slurs against him.[3] The assault lasted approximately one minute. Afterwards, Ballesteros was bruised and had a bloody nose, but did not seek medical attention.

Two and a half months later, on March 14, 2003, Cotter and the three defendants went bar-hopping in Salt Lake City. The group eventually separated, with Mr. Walker and Mr. Egbert returning home and Cotter and Mr. Massey accompanying two women they had met earlier that evening to another bar. The women began conversing with three men at another table, one of whom Cotter and Mr. Massey believed to be Native American. Mr. Massey told Cotter that

---

[2](...continued)
into a third world slum. They come for welfare or to take our jobs. They bring crime. They are messy, disruptive, noisy and multiply rapidly. Let's send them home now. National Alliance, an organization of whites who are not afraid to speak up for their race." Trial Tr. at 79.

[3] We refer to this incident as the O'Shucks assault.

they should beat up the Native American man. They devised a plan of inviting the three men to an after-party, and then assaulting them once they were outside. The group–Cotter, Mr. Massey, the three men, and the two women–left the bar together. They walked down the street to an area outside the Port O'Call bar, where Mr. Massey and Cotter started an argument, first hitting one of the white men, and then focusing their efforts on the Native American man, beating him until he stopped moving.[4] Cotter and Mr. Massey left the scene and went to Mr. Walker's house.

A grand jury sitting in the district of Utah indicted defendants on two counts. Count one charged defendants with conspiracy to interfere with civil rights from December 2002 to March 2003.[5] Count two charged defendants with aiding and abetting the interference with a federally protected activity.[6]

---

[4] We refer to this incident as the Port O'Call assault.

[5] The conspiracy count alleged three overt acts. The first act charged that Mr. Walker, Mr. Massey, and Mr. Egbert "intimidated, threatened, and coerced individuals of minority racial and ethnic heritage in a bar doing business as O'Shucks in Salt Lake City." Rec., vol. I at 3. The second act alleged that Mr. Walker, Mr. Massey, and Mr. Egbert "intimidated, threatened, coerced and assaulted J.B., a Mexican-American male[,] in or near a bar doing business as O'Shucks in Salt Lake City." *Id.* The third overt act charged that Mr. Massey "intimidated, threatened, coerced and assaulted an individual of Native-American heritage outside a bar doing business as the Port of Call [sic] in Salt Lake City." *Id.*

[6] The second count of the indictment alleged that defendants "did by force and threat of force, willfully injure, intimidate, and interfere with, and attempt to injure, intimidate, and interfere with J.B., a Mexican-American male, because of

(continued...)

-5-

Following a jury trial, defendants were found guilty of both counts. Mr. Egbert

received a sentence of 42 months imprisonment, Mr. Walker received 87 months,

and Mr. Massey received 57 months.


## II.

Mr. Egbert and Mr. Walker challenge the application of the Port O'Call

assault as relevant conduct, which resulted in a two-level increase to their

respective base offense levels.[7] They argue that because they were not involved

in the Port O'Call assault, and because there is insufficient evidence that the

assault was part of the larger conspiracy, the assault should not have been used as

relevant conduct in calculating their base offense levels.

Under section 1B1.3(a)(1)(B) of the sentencing guidelines, "in the case of a

jointly undertaken criminal activity," a defendant's offense level is determined by

"all reasonably foreseeable acts and omissions of others in furtherance of the

jointly undertaken criminal activity, that occurred during the commission of the

offense of conviction, in preparation for that offense, or in the course of

[6](...continued)
the individual's national origin, and because he was and had been enjoying employment, and the perquisites thereof, of a private employer." Rec., vol. I at 3-4.

[7] This section addresses the use of the Port O'Call assault as relevant conduct; we discuss separately in Part III, *infra*, the issue of whether the victim of the Port O'Call assault suffered "serious bodily injury," triggering the application of the aggravated assault guideline.

attempting to avoid detection or responsibility for that offense." U.S.S.G. §

1B1.3(a)(1)(B); *see also United States v. Tagore*, 158 F.3d 1124, 1129 (10th Cir.

1998) ("Section 1B1.3(a)(1)(B) provides that a defendant may be held

accountable for conduct that was both (1) reasonably foreseeable and (2) in

furtherance of a jointly undertaken criminal activity."). The district court found

that the Port O'Call assault was related to the larger conspiracy and was

foreseeable to Mr. Egbert and Mr. Walker,[8] and that it therefore could be applied

as an underlying offense pursuant to sections 1B1.3 and 2H1.1.[9] "We review the

district court's factual findings to determine whether there was clear error, and we

review the ultimate determination of relevant conduct de novo." *United States v.*

*Osborne*, 332 F.3d 1307, 1311 (10th Cir. 2003).

---

[8] Egbert Rec., vol. VII at 23 ("I find by a preponderance of the evidence that Mr. Egbert joined the conspiracy knowingly, and that it was the broader conspiracy, and that it involved all of the behaviors of his coconspirators, and that it was reasonably foreseeable that his coconspirators may go out on an assault prank or mission or opportunity and beat someone up really badly."); Walker Rec., vol. VII at 39-40 ("I have found by a preponderance of the evidence that the Port O'Call incident was related to the agreement that was reached by the defendants, and that it was in the nature of a conspiracy to target non-white individuals in the Salt Lake City area for violent acts against them.").

[9] Section 2H1.1, which governs offenses involving individual rights, directs the sentencing judge to calculate the base offense level by applying the greater of, *inter alia*, "the offense level from the offense guideline applicable to any underlying offense" or a level "12, if the offense involved two or more participants." U.S.S.G. § 2H1.1(a). The commentary explains, "'Offense guideline applicable to any underlying offense' means the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law (other than an offense that is itself covered under [§ 2H1.1])." *Id.* at cmt. n.1.

Defendants challenge the district court's finding that the assault perpetrated by Cotter and Mr. Massey at Port O'Call was committed "in furtherance of the jointly undertaken criminal activity" as required under section 1B1.3(a)(1)(B). They contend "the government did not show that [their] commitment to any found conspiracy extended beyond the single assault at O'Shucks." Walker Br. at 36. We cannot accept this proposition. Defendants were convicted of conspiracy to interfere with civil rights from December 2002 to March 2003, and they do not challenge this conviction. While the jury verdict was a general verdict, as defendants point out, it nonetheless established that the defendants had an agreement to harm "non-white" persons. The agreement was not required to be explicit: "the court may consider any 'explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.'" *Tagore*, 158 F.3d at 1130 (quoting U.S.S.G. § 1B1.3 cmt. n.2). The indictment alleged that "[i]t was the plan and purpose of this conspiracy to . . . go into public settings and public accommodations and provoke and engage in arguments and fights with persons the defendants perceived to be 'non-white,' in order to injure, oppress, threaten and intimidate those persons from exercising their protected rights." Rec., vol. I at 2.

An assault against a "non-white" individual by co-conspirators is certainly

-8-

related to the conspiracy to injure and intimidate "non-whites."[10] And, as the

government notes, the Port O'Call assault followed the same pattern as the

O'Shucks assault: "In both instances, members of the conspiracy encountered a

non-white person in a public place, lured the victim outside and then jointly

assaulted him."[11] Aple. Br. at 35. Furthermore, Mr. Egbert and Mr. Walker were

---

[10] The cases relied on by Mr. Egbert and Mr. Walker are distinguishable from the facts here. In each of those cases, and unlike here, there was no evidence that the defendant agreed to the criminal activity for which the relevant conduct enhancement was sought. *See United States v. Willis*, 476 F.3d 1121, 1124, 1130 (10th Cir. 2007) (remanding for further factual findings regarding scope of criminal activity defendant agreed to jointly undertake, where defendant was convicted of aiding and abetting the accessing of a protected computer and district court did not make particularized findings regarding an agreement by defendant to aid and abet identity theft); *United States v. Melton*, 131 F.3d 1400, 1405-1407 (10th Cir. 1997) (vacating relevant conduct enhancement because criminal conduct was not within scope of agreement and not reasonably foreseeable, where defendant was convicted of counterfeiting conspiracy but had no involvement in subsequent "reverse sting" operation); *United States v. Morales*, 108 F.3d 1213, 1225-1227 (10th Cir. 1997) (affirming district court's refusal to impose sentence for drug conspiracy where defendant was involved only in money laundering and quantity of drugs was not reasonably foreseeable to him).

[11] Defendants argue that Cotter and Mr. Massey carried out the assault not because of the victim's race but because he was talking to the women Cotter and Mr. Massey brought to the bar. While Callahan testified that the dispute over the women was Cotter's motivation for the assault and that it would not have mattered what race the men were, Cotter's testimony indicates that the assault was at least partially racially-motivated. Cotter said he did not know why Mr. Massey was so upset at the Native American man, but that he thought it was "just because he was an Indian," as "[Mr. Massey] does really not like Indians that much." Trial Tr. at 321. According to Cotter, Mr. Massey said, "let's just kick this white murderer's ass." *Id.* at 322. Cotter explained, "We came up with a plan basically to invite all three [men] back for an after bar party, and once we were outside to basically whip [the Native American's] ass." *Id.* Cotter also

(continued...)

-9-

in the company of Cotter and Mr. Massey earlier in the evening on the night of the assault, and when Cotter and Mr. Massey told them what happened the following morning, Mr. Walker responded "good job," and Mr. Egbert laughed. Trial Tr. at 330-32.

Defendants also argue that the Port O'Call assault was not reasonably foreseeable to them. Section 1B1.3(a)(1)(B)'s foreseeability requirement is easily satisfied here, however, given that the purpose of the conspiracy was to injure and intimidate "non-white" individuals, and that Mr. Egbert and Mr. Walker had participated in a similar assault against an individual they perceived to be "non-white" just ten weeks earlier.

We likewise reject Mr. Walker's argument that the conspiracy had been terminated or abandoned prior to the Port O'Call incident.[12] Again, defendants were charged and convicted with conspiracy "[f]rom in or about December 2002[] and *continuing until in or about March 2003*." Rec., vol. I at 2 (emphasis added). "[A] conspiracy, once instituted, continues to exist until it is abandoned,

---

[11](...continued)
testified that he told Mr. Egbert and Mr. Walker that he and Mr. Massey had assaulted the Native American victim because of his race. *See id.* at 331-332. Given this evidence, the district court's finding that the assault was related to the larger conspiracy is not clear error.

[12] It is not clear that Mr. Walker raised this argument below. Mr. Walker argued that the conspiracy did not extend to the second assault, but not that it had been abandoned. Nonetheless, we address this argument because it was put forward by Mr. Walker in response to a point first raised by the government.

-10-

succeeds, or is otherwise terminated by some affirmative act, such as withdrawal by the defendant." *United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992). Mr. Walker did not take any affirmative action to withdraw. To the contrary, he was in the company of the perpetrators of the assault the evening of the assault and the following day and expressed satisfaction at the result. For the foregoing reasons, we conclude that the district court did not err in applying the Port O'Call assault as relevant conduct to Mr. Egbert and Mr. Walker.

III.

Mr. Walker and Mr. Massey challenge the district court's enhancement of their sentences under sections 1B1.2(d) and 3D1.2 of the sentencing guidelines. Defendants were convicted of two counts: count one – conspiracy to interfere with civil rights, and count two – interference with a federally protected activity. Under count one, the indictment charged and the government argued that defendants committed three overt acts in furtherance of the conspiracy.[13] Because the jury returned a general verdict, the record does not reveal what the jury found regarding the scope of the conspiracy. We know only that the jury found defendants conspired to commit the O'Shucks assault because the jury convicted defendants of count two, which charged defendants for their actual participation

---

[13] *See supra* note 5.

in the O'Shucks assault.

For sentencing purposes, the district court treated count one as if it were two separate counts, each charging conspiracy to commit one of the substantive offenses. *See* U.S.S.G. §§ 1B1.2(d) and 3D1.2 cmt. n.8. The district court then grouped the conspiracy to commit the O'Shucks assault in count I with the substantive O'Shucks assault in count II, because both offenses involved the same act and the same victim. *See* U.S.S.G. § 3D1.2(a) and cmt. n.8. The district court considered the conspiracy to commit the Port O'Call assault as a separate count. Although defendants' arguments are far from straightforward, it appears they contend that the district court should not have enhanced their sentences by treating the overt acts listed in count one as two separate conspiracy counts.[14] *See* Walker Br. at 40; Massey Br. at 22-23.

Defendants' argument lacks merit. The district court correctly applied sections 1B1.2(d) and 3D1.2. The sentencing guidelines are clear that "[a] conviction on a count charging a conspiracy to commit more than one offense

_____

[14] The government argues Mr. Walker and Mr. Massey did not properly object to this issue, and the standard of review is therefore plain error. The government is correct only as to Mr. Massey. Mr. Walker did object to the division of count one and focused on the general nature of the jury verdict and the purported lack of evidence linking him to the Port O'Call assault. *See* Walker Rec., vol. VIII at 7-9; Walker Rec., vol. I, doc. 121 at 1-2. He does not, however, raise these grouping arguments here. Mr. Massey, on the other hand, did not raise this issue below and asserts no more than a conclusory argument on appeal. Because we ultimately conclude the district court did not commit error, plain or otherwise, the issue is of no matter.

shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). A court shall group "[a]ll counts involving substantially the same harm," such as when the counts "involve the same victim and the same act or transaction." U.S.S.G. § 3D1.2. Hence, a court will separate, for sentencing purposes, each substantive offense within a conspiracy conviction, and then group offenses that involve substantially the same harm as defined under section 3D1.2. Section 3D1.2's commentary illustrates this principle and provides a helpful example.

> A defendant may be convicted of conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. *See* § 1B1.2(d) and accompanying commentary. Then apply the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature. Example: The defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A. Treat this as if the defendant was convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; and (4) conspiracy to commit offense C. Count (1) and count (2) are grouped together under § 3D1.2(b). Group the remaining counts, including the various acts cited by the conspiracy count that would constitute behavior of a substantive nature, according to the rules in this section.

U.S.S.G. § 3D1.2 cmt. n.8.

The district court's sentencing calculation closely tracks the above example

and is a proper application of sections 1B1.2(d) and 3D1.2. The district court grouped the O'Shucks conspiracy offense from count I with the underlying substantive offense from count II, as both counts involved the same act and victim. *See* U.S.S.G. § 3D1.2(a); *see also id.* at cmt. n.8 ("A primary consideration in this section is whether the offenses involve different victims."). The court treated the conspiracy to commit the Port O'Call assault as a separate count, because this offense involved an entirely separate incident with a different victim. *Cf. United States v. Parker*, 551 F.3d 1167, 1173 (10th Cir. 2008) ("[W]hen there are multiple victims who are directly and seriously affected by the offense, grouping is not appropriate.") (quotation marks omitted); *United States v. Melchor-Zaragoza*, 351 F.3d 925, 928 (9th Cir. 2003) (holding district court properly divided conspiracy conviction into separate groups according to the number of victims); *United States v. Torrealba*, 339 F.3d 1238, 1242-43 (11th Cir. 2003) (same). Therefore, to the extent defendants challenge the district court's grouping of counts one and two, we conclude the district court did not err.

We add that Mr. Walker's challenge to the application of section 3D1.2 is premised on his argument that the Port O'Call assault should not be deemed relevant conduct. He contends that because the Port O'Call assault should not be considered as such, it should not have been applied as if it were a second conspiracy count. Because we hold that the district court did not err in treating the Port O'Call assault as relevant conduct, *see* Part II, *supra*, we reject Mr.

-14-

Walker's argument.

We also reject the basis for Mr. Massey's challenge.  He argues that "[t]he Port O'Call incident should not come into play as a second count of conviction," but does not provide support for this assertion.[15]  Massey Br. at 23.  He connects his grouping claim to his argument that the victim did not suffer serious bodily injury, but does not point to any error pertaining to the application of the grouping provision specifically.

Accordingly, we hold that the district court did not err in adjusting Mr. Walker and Mr. Massey's offense levels to consider conspiracy to commit the Port O'Call assault as a separate conspiracy count for sentencing purposes.

IV.

Mr. Walker and Mr. Massey challenge the district court's finding that the victim of the Port O'Call assault suffered serious bodily injury.  This finding increased their base offense level by seven levels:  two levels for the cross-reference to the aggravated assault guideline[16] and five levels for the serious

---

[15]  Mr. Massey relies on section 3D1.2's application note 4 in support of his argument that the district court incorrectly applied the grouping provision, but it does not support his claim.  Note 4 is relevant to the grouping of counts one and two together because they involved the same victim, not to the creation of a separate group for the Port O'Call assault, which involved a different victim.  *See* U.S.S.G. § 3D1.2 cmt. n.4.

[16]  Application of the aggravated assault guideline resulted in a base offense
(continued...)

bodily injury enhancement.[17] The sentencing court's determination that the victim suffered serious bodily injury is a finding of fact we review for clear error. *United States v. Perkins*, 132 F. 3d 1324, 1326 (10th Cir. 1997). For reasons explained below, we hold that there was insufficient evidence of serious bodily injury.

The guidelines define "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(L). By contrast, "bodily injury" is defined as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." *Id.* at cmt. n.1(B). Because there is no evidence that the victim of the Port O'Call assault required medical intervention of the type described above, or suffered "extreme physical pain," as opposed to "an injury

---

[16](...continued)
level of 14, 2 levels above the base offense level for civil rights offenses involving two or more participants. *See* U.S.S.G. §§ 2A2.2(a) & 2H1.1(a)(2). "Aggravated assault" is defined as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) *serious bodily injury*; or (C) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1 (emphasis added).

[17] Section 2A2.2(b)(3) permits a five-level increase in the base offense level if the victim sustained serious bodily injury. The commentary specifies that "serious bodily injury" follows the definition provided in section 1B1.1 cmt. n.1. U.S.S.G. § 2A2.2 cmt. n.1.

-16-

that is painful and obvious" we are left with the question of whether the victim experienced "protracted impairment of a function of a bodily member, organ, or mental faculty." *Id.* at cmt. n.1(L).

The victim of the Port O'Call assault was never located, and the only evidence presented at trial regarding the extent of the victim's injuries was the testimony of two individuals: Cotter, a participant in the assault, and Valerie Hodge, a bystander. Cotter testified that he "grabbed the [victim] around his midsection and trapped his arm and lifted him up and turned him and put him on his head," and then continued to punch him as he was laying on his stomach. Trial Tr. at 327 & 328. He reported that the fight lasted "probably a couple [of] minutes." *Id.* at 328. When the fight stopped, the victim was not moving and Cotter believed him to be "knocked out." *Id.* He described the victim's condition: "He was unconsciousness. I am pretty sure–I don't know, and I have not seen his medical records, but I am pretty sure I broke his cheekbone." *Id.*

Valerie Hodge, who observed the incident from her vehicle, testified that the altercation lasted "[j]ust a minute or two" and that Cotter "threw [the victim] to the ground and hit his head into the street." *Id.* at 468. According to Hodge, when the fight ended, the victim "was unconscious . . . .[and] bleeding from his head." *Id.* at 469. She believed him to be "[e]ither seriously hurt or dead." *Id.* She reported that the victim's "friends came up and one sat with him for a second on the corner and dragged him to where . . . the streetlight is, and held him in his

-17-

lap until the other kid came and picked him up and they drove away."[18]  *Id.*

A second bystander, who was interviewed by investigators but did not testify at trial, reported observing the victim "being kicked and hit by multiple suspects," "dragged to the sidewalk," and "rendered unconscious."  Massey Rec., vol. XII at 4-5.  The witness "feared that [the victim] was dead."  *Id.* at 5.  Mr. Massey also indicated that he believed the victim was "seriously hurt."  *Id.* at 9.

Cases from this and other circuits upholding serious bodily injury enhancements involve substantially more evidence of serious injury requiring medical treatment than the evidence presented here.  *See, e.g.*, *United States v. Woodlee*, 136 F.3d 1399, 1404, 1409 (10th Cir. 1998) (medical records revealed victim, who required surgery, had suffered permanent scarring of the retina from being shot in the eye and had pellets lodged in head, face, and back); *United States v. Dennison*, 937 F.2d 559, 562 (10th Cir. 1991) (testimony of treating physician and victim revealed victim suffered seven lacerations on face, neck, and upper chest, requiring forty-eight sutures); *United States v. Long Turkey*, 342 F.3d 856, 858-859 (8th Cir. 2003) (undisputed facts showed victim required overnight hospitalization for rectal laceration, abdominal pain, and bruised scalp following

---

[18]  Mr. Walker argues that the victim may have been playing dead in an effort to bring the assault to an end.  While that account is made somewhat less plausible by the testimony that the victim was physically dragged away by his friends, it is nonetheless a possible explanation, at least in the absence of any evidence to the contrary.

sexual assault); *United States v. Rodgers*, 122 F.3d 1129, 1133 (8th Cir. 1997) (evidence introduced at trial showed victim suffered multiple blows to back of head, requiring several stitches, and bruises to arms and shoulder, and later developed posttraumatic stress disorder); *United States v. Newman*, 982 F.2d 665, 672 (1st Cir. 1992) (medical testimony showed victim suffered severe headaches, facial bruising, hemorrhaging, and inner ear injury and required six-day hospitalization); *United States v. Corbin*, 972 F.2d 271, 272 (9th Cir. 1992) (uncontested facts showed victim suffered head injury requiring more than twenty-five sutures). While the government is correct to point out that "there is no case law requiring that a victim be identified in order to find that serious bodily injury occurred," Aple. Br. at 40, the case law does require something more by way of proof that serious bodily injury occurred than what we have here. "[I]t is the actual nature of the *injury* sustained and not generalized statements concerning the nature of the conduct . . . that must be the focus of the district court's determination." *Perkins*, 132 F.3d at 1326 (emphasis in original); *accord United States v. Mejia-Canales*, 467 F.3d 1280, 1284 (10th Cir. 2006).

The government contends that the evidence supports a finding that the victim lost consciousness, which, according to the government, constitutes a protracted impairment of a mental faculty. Even if the witnesses were correct in their belief that the victim lost consciousness, we do not know whether the injury was "protracted," and the cases cited by the government do not support the

-19-

contention that a brief loss of consciousness without more satisfies the definition of serious bodily injury.[19] While the court in *United States v. Thompson*, 60 F.3d 514, 516, 518 (8th Cir. 1995)*,* mentions "the impairment of [the victim's] mental faculties when he was knocked unconscious" as relevant to its finding that the evidence supported an enhancement for serious bodily injury, it also noted that the victim required hospitalization and treatment for a concussion, black eyes, and abrasions to the head and face. The government also relies on *Dennison*, but that case involved a different definition of serious bodily injury, which specifically included unconsciousness as an indication of such injury. 937 F.2d at 562.

We conclude that there was insufficient evidence of a "protracted impairment of a function of a bodily member, organ, or mental faculty" to uphold the district court's finding that the victim of the Port O'Call assault suffered serious bodily injury as opposed to bodily injury.

V.

Mr. Walker challenges the four-level enhancement he received for his role as an "organizer or leader" under section 3B1.1(a) of the sentencing guidelines.[20]

---

[19] The Ninth Circuit has noted that unconsciousness by itself might not be enough to constitute serious bodily injury for statutory purposes. *United States v. Johnson*, 637 F.2d 1224, 1246 (9th Cir. 1980), *abrogated on other grounds by Schmuck v. United States*, 489 U.S. 705, 734 (1989).

[20] Section 3B1.1(a) provides: "If the defendant was an organizer or leader
(continued...)

The government bears the burden of proving the facts necessary to support the enhancement by a preponderance of the evidence. *United States v. Torres,* 53 F.3d 1129, 1142 (10th Cir. 1995). We review the district court's finding for clear error. *Tagore*, 158 F.3d at 1130.

"To impose the 4-level increase, the sentencing court must make two findings of fact: first, that defendant [wa]s an organizer or leader; and, second, that the criminal activity involved five or more participants or was otherwise extensive." *United States v. Roberts*, 14 F.3d 502, 523 (10th Cir. 1993). In determining whether the defendant was an organizer or leader of a criminal activity, the district court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Tagore*, 158 F.3d at 1131 (quoting U.S.S.G. § 3B.1.1 cmt. n.4). While an individual can be an *organizer* without exercising control over the other participants, to be a *leader* the defendant must have exercised control over one or more participants in the group. *See id.* ("The gravamen of the enhancement is either the exercise of control over other participants or the organization of others

---

[20](...continued)
of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a).

for the purpose of carrying out the crime.").

We do not have evidence that Mr. Walker served as an organizer, and the government does not argue otherwise. Nor do we have sufficient evidence that Mr. Walker exercised control over one or more participants of the group. From the record, it does not appear that Mr. Walker exercised any more authority than any of the other members of the group. The government maintains that "[b]ecause of Walker's leadership of the larger group, the members of the sub-group that agreed to use violence against non-whites in the Salt Lake City area continued to look to him for leadership," but does not provide any evidence to support this assertion. Aple. Br. at 52. The mere fact of Mr. Walker's leadership position in the NA does not indicate that he held a leadership position with respect to the criminal enterprise. *See United States v. Litchfield*, 959 F.2d 1514, 1523 (10th Cir. 1992) (noting that the fact defendant was an organizer or leader of the affiliated non-criminal activity (a mining operation) was irrelevant to determining whether the defendant was an organizer or leader of the criminal activity (a fraudulent marketing scheme and the conspiracy)).

The government asserts that "Walker exercised leadership control over Cotter" and that "Cotter learned from Walker how to execute [the assaults] for maximum effectiveness and justifiably believed that the assaults on non-whites had Walker's imprimatur." Aple. Br. at 53. Again, however, the government

-22-

does not point to any evidence in the record that supports this claim.[21]  In fact, Cotter testified that he was not as close to Mr. Walker as he was to Mr. Egbert and Mr. Massey, and that it was Mr. Massey, not Mr. Walker, who served as his mentor during the relevant time period.

Nor do Mr. Walker's actions the night of the O'Shucks assault establish evidence of leadership, as the government argues.  While Cotter testified that Mr. Walker initially proposed assaulting the bartender, such a statement does not establish leadership.  *See* U.S.S.G. § 3B.1.1 cmt. n.4 ("This adjustment does not apply to a defendant who merely suggests committing the offense.").  Moreover, Cotter also said that Mr. Massey agreed and encouraged him.  Cotter was ultimately unsure who initiated the plan: "I said I didn't know who suggested what as far as the plan to get [the bartender] to leave the bar . . . . I am pretty sure I came up with it–I am not positive, but somebody may have suggested it to me or they may not have."  Trial Tr. at 430-31.  Finally, it was Cotter himself who took charge of provoking the bartender so that he would step outside the bar, and then grabbed him by the neck and dragged him outside.

---

[21]  The government also asserts that Mr. Walker "encouraged violence against non-whites at gatherings of the subgroup, including playing music that expressed messages not only of racial separatism but also of targeting non-whites for violence."  Aple. Br. at 51.  Yet the excerpts of transcript cited in support of this statement make no mention of Mr. Walker taking any role in encouraging this behavior.  Instead, Cotter testified only that *all* members of the group expressed agreement with the messages of the songs.

Even if we were to conclude that Mr. Walker "was an important figure who was integral to the success of th[e] conspiracy," an enhancement under section 3B1.1(a) would not be warranted without a further showing of control. *Torres*, 53 F.3d at 1143 ("While the district court may have properly categorized [the defendant] as the 'engine' that made this operation run, that fact bears on his relative importance to the organization, and not on whether he was a leader or organizer who exhibited control over those other individuals."); *see also Litchfield*, 959 F.2d at 1523 ("We accept the district court's finding that defendant was essential to the success for the fraudulent scheme and was deeply involved in the gold mining operation; such a finding is relevant, but not conclusive. Section 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." (citation omitted)). Because there is no evidence that Mr. Walker exercised control over any of the participants, we conclude the district court erred in finding that he was a leader or organizer warranting an enhancement under section 3B1.1(a).

Mr. Walker also contends the criminal activity involved fewer than five participants. The government argues that Mr. Walker waived this argument by not objecting below, and the standard of review is therefore plain error. Because we conclude that Mr. Walker was not a leader or organizer and therefore cannot receive a sentencing enhancement under section 3B.1.1(a), we need not reach this issue.

VI.

We **REVERSE** the district court's findings that the victim of the Port O'Call assault suffered serious bodily injury and that Mr. Walker was a leader or organizer of criminal activity,[22] although we **DENY** the other challenges raised by defendants. Accordingly, we **REVERSE** the sentences of Mr. Massey and Mr. Walker, and **REMAND** to the district court to resentence them in accordance with this opinion. We **AFFIRM** Mr. Egbert's sentence.

---

[22] Given our conclusion that Mr. Walker's sentence was procedurally unreasonable, we do not address his substantive unreasonableness claim.