FILED
United States Court of Appeals
Tenth Circuit

May 6, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JUAN MANUEL CORTEZ-DIAZ,

Defendant - Appellant.

No. 12-3219
(D.C. No. 2:11-CR-20031-CM-1)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.

After a nine-month investigation, law enforcement arrested Juan Manuel Cortez-Diaz with about two pounds of pure methamphetamine in his car and, soon after, seized about seven more pounds at his stash house. The evidence at trial showed that Cortez-Diaz ran a multi-state methamphetamine distribution network centered in Kansas City, Kansas, and based on this evidence the jury convicted him of various drug possession and

---

[*] This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rules of Appellate Procedure and Tenth Circuit Rule 32.1.

distribution crimes.[1] The weight and purity of the methamphetamine, combined with leadership-role and drug-house enhancements, led to an advisory guideline sentence of life imprisonment—which the district court imposed. Cortez-Diaz now challenges the procedural and substantive reasonableness of that sentence. We conclude that the district court committed no error, and we affirm.

## BACKGROUND

Special Agent Matt Hall of Homeland Security Investigations[2] (HSI) began investigating Cortez-Diaz after a confidential informant (CI) reported that Cortez-Diaz had recently arrived in Kansas City from California to set up a drug-distribution network.

On August 9, 2010, the CI bought methamphetamine from Cortez-Diaz at a local market. After providing the CI with $2,600 in buy-money, Agent Hall watched from a safe distance as Cortez-Diaz opened his trunk and the two men completed the exchange. Following routine controlled-buy procedures, the agents recovered the two ounces of purchased methamphetamine.[3]

---

[1] The jury convicted Cortez-Diaz on five separate violations of 21 U.S.C. § 841(a)(1): (1) distributing more than five grams of methamphetamine (Count one, August 9, 2010); (2) distributing methamphetamine (Count two, October 6, 2010); (3) possession with intent to distribute methamphetamine (Count three, October 22, 2010); (4) distributing more than five grams of methamphetamine (Count four, December 8, 2010); and (5) possession with intent to distribute more than 50 grams of methamphetamine (Count five, May 16, 2011).

[2] Homeland Security Investigations is a part of the United States Department of Homeland Security, Immigration and Customs Enforcement.

[3] The weight of the methamphetamine was later determined to be 49.4 grams with a 37.9% purity (18.7 grams of actual methamphetamine).

On September 22, 2010, the CI introduced Agent Hall to Cortez-Diaz, who was accompanied by Alfredo Soto-Contreras. Agent Hall was acting in an undercover role as a driver for a parcel delivery company. After being introduced, Agent Hall complained to Cortez-Diaz about the poor quality of methamphetamine that Cortez-Diaz had sold the CI on August 9. Cortez-Diaz apologized, explaining that that methamphetamine hadn't come from his usual supplier. He promised to make it up the next time Agent Hall bought methamphetamine from him or Soto-Contreras. During this same meeting, Agent Hall asked if he could transport drug money for Cortez-Diaz as part of his parcel service job. Agent Hall claimed that he already "ran money" for narcotics distributors and could do so all the way to California. Agent Hall testified that Cortez-Diaz expressed interest in the plan but needed to clear it with his bosses.

On October 6, 2010, Agent Hall and the CI met with Cortez-Diaz and another associate, Martin Gonzalez. This meeting was set to continue discussing the possibility of Agent Hall's transporting drug money for Cortez-Diaz. Agent Hall arrived in a company van to make the story believable. Cortez-Diaz raised the possibility of using the van to take money to Oklahoma and to bring back more methamphetamine. During the meeting, Cortez-Diaz handed Agent Hall a shard of methamphetamine.[4] Agent Hall understood that Cortez-Diaz was proving to him that he could obtain high-quality drugs.

On October 22, 2010, Agent Hall and the CI were again set to meet with Cortez-Diaz. Instead, Cortez-Diaz sent two other men, Martin Gonzalez and Alfredo Soto-Contreras, to

---

[4] The methamphetamine weighed 0.81 grams and was 99.2% pure.

explain that he couldn't make the meeting but to reset it for that afternoon. Later, Cortez-Diaz came with Oscar Sotello and apologized for missing the earlier meeting. He attributed his delay to law enforcement's possibly having seized a load of his organization's methamphetamine. Cortez-Diaz again expressed interest in using the parcel delivery company to run drug money to other cities but delayed making a final decision. Cortez-Diaz then showed Agent Hall an ounce of "good" methamphetamine and named a price—$1,300 for the ounce, or $18,500 for a pound. Agent Hall held the bagged methamphetamine and could see that it was very pure. Because he had no buy-funds, however, he declined to purchase and made an excuse that he couldn't be carrying methamphetamine in the company van.

On December 8, 2010, Agent Hall and the CI met again with Cortez-Diaz about transporting drug money and also to buy methamphetamine. At this meeting, Cortez-Diaz told Agent Hall that he'd found another "source" that would "drive the loads back and forth" but that "they" were still deciding whether to use Agent Hall's delivery company locally. R. vol. II, at 300–01. Cortez-Diaz handed Agent Hall an ounce of pure-looking methamphetamine, and Agent Hall handed him $1,300.[5] Although Agent Hall tried to arrange another meeting with Cortez-Diaz, it never happened.

In late April 2011, HSI agents learned from a court-authorized wiretap that a man named Juan Razo may have been working as Cortez-Diaz's driver, taking drug money from Kansas City to California. In a series of monitored calls from May 13 to May 16,

---

[5] The methamphetamine weighed 29.5 grams and was 100% pure.

Razo told Cortez-Diaz that he was bringing nine cans or buckets of paint to Kansas City. The agents believed the "cans" or "buckets" referred to kilograms or pounds of methamphetamine. From the call, they knew that about half the total load was destined for an unknown person, "Guerrillo." During the calls, Cortez-Diaz directed Razo—he told him when to leave, some details about a stash house, that he could provide Razo with a place to sleep in Kansas City, and that he could avoid police detection by turning off his cell phone and using cruise control.

On May 16, 2011, once Razo arrived in Kansas City, he met with Cortez-Diaz at a flea market. HSI witnessed this meeting through covert surveillance of Cortez-Diaz. Cortez-Diaz then drove Razo to the stash house on Washington Avenue in Kansas City, Kansas. They stayed there about five minutes before Cortez-Diaz took Razo back to the flea market and returned to his apartment. Later that evening, Cortez-Diaz returned to the flea market, picked up Razo, and the two men returned to the stash house.

While at the house, Cortez-Diaz received a call from "Miguel" and arranged to sell him a pound of methamphetamine. Soon after the call, HSI agents saw Cortez-Diaz walk to the end of the driveway, pick up and empty a shoebox from a trash pile, and return inside. A few minutes later, Cortez-Diaz left the stash house, put the shoebox inside the trunk of a car, and drove away. HSI called local police to have them stop Cortez-Diaz, which they did after seeing him commit a traffic violation. During the stop, Cortez-Diaz consented to a search of the car. Inside the trunk, the officers found nearly two pounds (891.9 grams) of methamphetamine in the shoebox; its purity was 99.7%.

HSI agents obtained a search warrant for the stash house. Inside they found Razo, over five and half pounds (2,583 grams) of methamphetamine (99.1% pure) in one container, another pound (488.3 grams) of methamphetamine (99.5% pure) in a second container, a digital scale, and drug-packaging material. There was no furniture, and it appeared that no one lived at the house.

After his arrest, Razo waived his right to remain silent and spoke with the agents. He said that he'd made six trips for a named drug organization, transporting methamphetamine and cash. Consistent with the recorded calls, he said that in April 2011 he'd previously delivered a load of methamphetamine to Kansas City as organized by Cortez-Diaz and Martin Gonzalez. Razo explained that he then returned to Kansas City to collect $80,000 in methamphetamine sales proceeds. He also told the agents that Martin Gonzalez had loaded the $80,000 into his vehicle. For the current trip, he said half of the drugs had gone to Cortez-Diaz and the other half had gone to another person. Razo told the agents that seven pounds of methamphetamine remained in the stash house from the nine pounds he had delivered to Cortez-Diaz (who was arrested with the other two pounds).

A grand jury indicted Cortez-Diaz on five counts of methamphetamine trafficking. The jury convicted on all counts. On its special verdict form, the jury specifically found that Cortez-Diaz had possessed both the methamphetamine seized in the stash house and in his car.

Before sentencing, the United States Probation Office for the District of Kansas prepared a Presentence Investigation Report (PSR). The PSR detailed the factual background of the offenses and incorporated Razo's post-arrest statements. It included a base offense level of 38 given Cortez-Diaz's responsibility for 7.07 kilograms (over fifteen pounds) of methamphetamine—the sum total of all the actual methamphetamine involved in Cortez-Diaz's relevant conduct.[6] The PSR recommended a two-level enhancement for maintaining a stash house and a four-level enhancement for Cortez-Diaz's leadership of a criminal activity with five or more participants.[7] *See* U.S. Sentencing Guidelines Manual (U.S.S.G.) § 2D1.1(b)(12), § 3B1.1(a) (2012). Because the sentencing table has a maximum total offense level of 43, however, the PSR's total offense level was reduced to that number. *See* U.S.S.G. ch. 5, pt. A, Sentencing Table, cmt. n.2. At total offense level 43, the Guidelines provide an advisory sentencing range of life imprisonment. U.S.S.G. ch. 5, pt. A, Sentencing Table.

Cortez-Diaz argued that he shouldn't be found responsible for the methamphetamine seized from the stash house. He also objected to the PSR's recommended enhancements

---

[6] This amount far exceeded the "more than 1.5 kilograms" required to reach a base offense level of 38. U.S.S.G. § 2D1.1(c)(1). Because this resulted in the maximum base offense level of 38, the district court had no need to include as relevant conduct Razo's earlier methamphetamine delivery to Cortez-Diaz, the one yielding $80,000 in proceeds. But had it mattered, this methamphetamine would also have counted as part of the base offense level calculus. *See* U.S.S.G. § 1B1.3.

[7] Although the PSR also included a two-level enhancement because Cortez-Diaz knew the methamphetamine had been imported unlawfully, the district court didn't impose this enhancement after the government conceded it wouldn't affect the applicable total offense level. *See* U.S.S.G. § 2D1.1(b)(5).

for maintaining a stash house and for his leadership role. He requested a downward variance based on mitigating factors such as his age, familial situation, and lack of criminal history.[8] After hearing argument, the district court imposed the recommended base offense level of 38 and six additional levels for the two disputed enhancements. After considering the 18 U.S.C. § 3553(a) sentencing factors and the requested downward variance, the district court ultimately imposed the recommended Guidelines sentence of life imprisonment.[9]

## DISCUSSION

"On appeal, the district court's sentence is reviewed for reasonableness under an abuse-of-discretion standard." *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013). Sentencing review proceeds in two steps. First, we address whether the court committed procedural error. *United States v. Lente*, 647 F.3d 1021, 1030 (10th Cir. 2011). This step includes reviewing the court's Guidelines calculation—in that process, legal conclusions are reviewed de novo and the factual findings for clear error. *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006) (per curiam). When reviewing the application of sentencing enhancements, "we view the evidence and inferences therefrom in the light

---

[8] Indeed, Cortez-Diaz had no countable criminal history points and just one listed arrest—on May 17, 2011, he was arrested in Kansas City, Kansas, for possession of opiates/opium/narcotic drugs.

[9] We focus only on the life sentence imposed for Count five as the sentences for the other four counts are for lesser terms of years to be served concurrently and don't affect our analysis.

most favorable to the district court's determination." *United States v. Mozee*, 405 F.3d 1082, 1088 (10th Cir. 2005).

Second, we address substantive reasonableness, which we review for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence must fall within the range of permissible choice. *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007). We may assume a within-Guidelines sentence is reasonable, but we aren't required to do so. *Peugh*, 133 S. Ct. at 2080.

## 1. Procedural Challenges

Procedural error "relates to the method by which the sentence is calculated." *Lente*, 647 F.3d at 1030 (internal quotation marks omitted). The Supreme Court recognizes at least five types of procedural error: (1) improperly calculating the Guidelines range; (2) adhering to the Guidelines as though they are mandatory; (3) failing to consider the 18 U.S.C. § 3553(a) sentencing factors; (4) basing a sentence on clearly erroneous facts; and (5) failing to adequately explain the sentence. *Id.* (quoting *Gall*, 552 U.S. at 50–51). Although a sentence must be adequately explained, within-Guidelines sentences require only a general statement of the court's reasons and don't need explicit references to the § 3553(a) factors or to every rejected argument for leniency. *Id.* at 1034.

Cortez-Diaz first claims the district court miscalculated his sentence by including within his relevant conduct too much actual methamphetamine and by applying two enhancements—one for maintaining a stash house and another for his aggravating role in

the offense (as a leader). In addition, he argues that the district court procedurally erred by inadequately explaining the basis for the sentence.

*Drug Quantity*. In a jointly undertaken criminal activity involving controlled substances, a defendant is responsible for all drugs with which he was directly involved or that were reasonably foreseeable within the scope of the joint-criminal activity. U.S.S.G. § 1B1.3(a)(1)(A)–(B); *see id.* at cmt. n.2. Cortez-Diaz concedes that he was directly involved with the drugs found in his car but thinks it was error for the district court to include the stash-house methamphetamine in calculating his base offense level. He claims "the evidence at trial did not prove by a preponderance that [he] actually or constructively possessed [the] packages of methamphetamine" found in the house. Appellant's Br. 30.

This argument rests upon two mistaken premises—first, that a defendant is only accountable under U.S.S.G. § 1B1.3 for controlled substances he *possesses*, and second, that for relevant conduct purposes this possession must be proved by the government at trial. In fact, as stated above, U.S.S.G. § 1B1.3 applies whenever a defendant is directly involved with the drugs in question—even if he didn't possess them. And in evaluating this involvement, a district court isn't limited to trial evidence. Instead, "*[a]ny* information may be considered [at sentencing], so long as it has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3 cmt. (emphasis added); *see United States v. Ruby*, 706 F.3d 1221, 1227 (10th Cir. 2013) ("[A]t a sentencing hearing the court can have access to any relevant information . . . . Sentencing courts historically

rely on a wide array of information relevant to the individualized needs of the offender, including hearsay evidence . . . ."). Accordingly, the district court was free to consider any reliable relevant information in assessing Cortez-Diaz's connection to the drugs at issue.

In this case, the district court relied on evidence presented at trial as well as in the PSR in concluding that Cortez-Diaz was accountable for the stash-house drugs. We find no error as this conclusion was well supported. After all, the jury found by special verdict that Cortez-Diaz possessed the methamphetamine in the house. Regardless of whether actual possession is dispositive under U.S.S.G. § 1B1.3(a)(1)(A), it is certainly strong evidence of direct involvement.

Yet the district court didn't just rely on the jury's special verdict, but instead found that trial evidence linked Cortez-Diaz to the stash house. The court pointed out that Cortez-Diaz discussed the house on the phone with Razo. From the intercepted calls, we know that it is indeed true that Cortez-Diaz gave Razo directions to the house before Razo arrived in Kansas City. We also can glean from the calls that Cortez-Diaz offered to arrange for someone in his organization to meet Razo when he arrived and take him to the stash house.[10] Further, the court noted Cortez-Diaz's presence at the stash house on two occasions. As HSI observed, Cortez-Diaz twice took Razo to the stash house where the methamphetamine was later found and went inside with him. And, before leaving the house with the shoebox, we know from the calls that Cortez-Diaz arranged a

---

[10] Because HSI only had visual surveillance on Cortez-Diaz on May 16, 2011, the record is unclear on when or how the methamphetamine was unloaded at the stash house.

- 11 -

methamphetamine sale from the house. All of these facts support Cortez-Diaz's connection to the stash house and, by extension, his direct involvement with the methamphetamine found there. *See* U.S.S.G. § 1B1.3(a)(1)(A).

Cortez-Diaz doesn't address this strong evidence against him, but he does argue that the district court erred in relying on the single unsupported PSR statement that "Cortez and Razo both pulled bags from the trunk of the vehicle" before entering the stash house. R. vol. III, at 10. This was just one point the court made in reaching its ultimate conclusion that Cortez-Diaz was accountable for the stash-house drugs. But even so, a court is entitled to rely on uncontested facts within the PSR. Fed. R. Crim. P. 32(i)(3)(A). Since Cortez-Diaz never contested the accuracy of this specific fact, or any specific fact, the district court was free to accept it as uncontroverted and consider it during sentencing. *See United States v. Warren*, 737 F.3d 1278, 1285–86 (10th Cir. 2013) ("Rule 32(i)(3)(B) applies only if facts in the PSR are disputed by specific objection.").

In addition, even had Cortez-Diaz neither carried the methamphetamine into the house nor aided and abetted Razo in doing so, his relevant conduct would still include that methamphetamine. The district court also based its finding on the fact that Cortez-Diaz and Razo worked together, a finding that was well supported by the wiretap conversations. Indeed, since Cortez-Diaz and Razo were engaged in "jointly undertaken criminal activity" within the meaning of § 1B1.3(a)(1)(B), Cortez-Diaz was responsible for all reasonably foreseeable acts of Razo in furtherance of those activities. Here, this included Razo's bringing Cortez-Diaz nine pounds of methamphetamine from California

under their express understanding and agreement. Accordingly, even had Razo been arrested before meeting up with Cortez-Diaz, Cortez-Diaz's relevant conduct would still have included the entire nine pounds. In sum, the district court didn't err in concluding that Cortez-Diaz was responsible for the seven pounds of methamphetamine at the stash house based on the aforementioned information.

*Stash house*. The Guidelines provide for a two-level enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). To determine whether the defendant "maintained" the stash house, the Guidelines commentary instructs courts to consider "(A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Id.* at § 2D1.1 cmt. n.17. Among the qualifying uses of the maintained premises are distributing a controlled substance or storing the controlled substance there to distribute it elsewhere. *Id.*

Cortez-Diaz contends that the government failed to show he maintained a stash house. He claims that his brief presence at the house and his vague phone calls with Razo are insufficient to support the enhancement. By his characterization, he was just a casual visitor to the stash house with no substantial connection to it. *See United States v. Flores-Olague*, 717 F.3d 526, 532 (7th Cir. 2013) ("[A]lthough ownership is not dispositive of whether a defendant maintains a stash house, the statute contemplates a defendant who is more than a casual visitor." (internal quotation marks omitted)).

- 13 -

Cortez-Diaz was anything but a casual visitor. After all, as the district court recognized, he left the house with a shoebox containing 891.9 grams of methamphetamine. Further, trial evidence supported the district court's finding that Cortez-Diaz controlled access to the stash house. As the district court observed, Cortez-Diaz "directed Juan Razo to go to the house, to lock himself in, and wait for [him]." R. vol. II, at 785. Cortez-Diaz then twice took Razo to and from the house. The court also found it significant that the house had no furniture. Indeed, its only noted contents were seven pounds of methamphetamine, drug packaging materials, a digital scale, and Razo's luggage. All told, this information is more than enough to establish that Cortez-Diaz maintained the house to store or distribute a controlled substance. § 2D1.1 cmt. n.17. Again, we see no error by the district court.

*Organizer or leader of criminal activity with five or more participants.* A district court may impose a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). To apply this enhancement, therefore, the district court needed to find two things: first, that Cortez-Diaz was a leader or organizer; and, second, that five or more people were participants in the criminal activity. *United States v. Egbert*, 562 F.3d 1092, 1103 (10th Cir. 2009).

To decide whether the defendant was a leader or organizer, the Guidelines commentary instructs us to consider various factors: decision-making authority, participation in the offense, recruitment of accomplices, claiming a larger share of the crime proceeds, the amount of participation in planning or organizing the offense, the

nature and scope of the illegal activity, and the amount of control exercised over others. U.S.S.G. § 3B1.1 cmt. n.4. To qualify as a leader, the defendant must exercise authority over at least one of the participants. *Egbert*, 562 F.3d at 1103. A participant must be criminally responsible for the commission of the offense, but the person need not be charged or convicted. § 3B1.1 cmt. n.1; *see United States v. Scott*, 529 F.3d 1290, 1303 (10th Cir. 2008) ("A participant, in turn, must be criminally responsible for the commission of the offense even if he or she was not charged or convicted." (internal quotation marks omitted)).

In this case, the district court found that Cortez-Diaz was a leader of a particular methamphetamine ring in Kansas City. Cortez-Diaz disputes that he qualified as a leader and that five or more people participated in the criminal activity. He challenges his leadership role, saying that the trial evidence doesn't prove by a preponderance that he controlled Razo, recruited accomplices, or claimed a larger share of the proceeds. Additionally, Cortez-Diaz claims that trial evidence only supports a finding that Razo was a participant in the criminal activity.

Again, Cortez-Diaz mistakenly assumes that trial evidence is needed to support Guidelines enhancements. Yet as stated, the trial court is free to look outside the trial record for reliable evidence. *See Ruby*, 706 F.3d at 1227. Here for instance, the district court was free to consider Razo's post-arrest statements in the PSR, even though Razo didn't testify at trial. *See United States v. Cook*, 550 F.3d 1292, 1296 (10th Cir. 2008)

("[H]earsay statements may be considered at sentencing if they bear some minimal indicia of reliability." (internal quotation marks omitted)).

Regardless, the trial evidence also supported the district court's finding that Cortez-Diaz "had access to and control over large amounts of drug proceeds, which would indicate . . . a leadership position." R. vol. II, at 787. Agent Hall testified that Cortez-Diaz discussed and expressed interest in his offer to transport large amounts of Cortez-Diaz's drug proceeds on three separate occasions. The taped phone calls also showed that Cortez-Diaz controlled the shipment of proceeds and drugs from California and the subsequent sale of those drugs. After all, Cortez-Diaz told Razo when to begin his trip; he met him at an agreed location and took him to the stash house; and he left the house alone with two of the nine pounds of methamphetamine to sell after taking a call from a buyer. Agent Hall also testified that he believed Cortez-Diaz was a high-level drug dealer based on the nearly pure methamphetamine he supplied, his knowledge of seized drug shipments, and an analysis of his phone records. In fact, Agent Hall testified that Cortez-Diaz was a regional cell head of a methamphetamine distribution network.

Further, the district court found that Cortez-Diaz directed Razo's activities. Indeed, the trial evidence shows that Cortez-Diaz told Razo when to sleep, how to drive while carrying the shipment, and how to avoid police tracking by turning off his cellphone. Additionally, the PSR specifically states that "Razo was given directions by Cortez[-Diaz]." R. vol. III, at 11. Also, Cortez-Diaz had control over Martin Gonzalez and Alfredo Soto Contreras, as shown by his sending them to meet with Agent Hall.

The district court's finding that there were at least five other participants in the criminal activity is also well supported. At trial, the government's evidence implicated Alfredo Soto-Contreras, Martin Gonzalez, "Miguel," "Guerillo," and Juan Razo—five different individuals.[11] First, Alfredo Soto-Contreras accompanied Cortez-Diaz to meet with the undercover agent. At that meeting, they discussed transporting drug proceeds. Later, Cortez-Diaz sent Soto-Contreras to meet with the undercover agent when Cortez-Diaz was running late. Second, Martin Gonzalez also accompanied Soto-Contreras to meet with the undercover agent. And the PSR included Razo's statement that Martin had loaded the $80,000 in drug proceeds into Razo's vehicle. Third, "Miguel" arranged to purchase a pound of methamphetamine from Cortez-Diaz by phone. During the call, they discussed the quantity, quality, and price of the drugs. Fourth, "Guerillo" was to receive nine pounds of methamphetamine from Razo.[12] Fifth, and finally, Cortez-Diaz concedes that Razo was a participant. That makes five participants in addition to Cortez-Diaz. *See United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994) ("[W]hen determining the number of participants, the defendant is considered to be one of the five."). And even though all of these participants weren't prosecuted, their knowing involvement in a

---

[11] Another individual, Oscar Sotello, was also present at the October 22, 2010 meeting between Agent Hall and Cortez-Diaz, which adds a sixth individual into the mix.

[12] Even though "Miguel's" and "Guerillo's" last names were unknown, the district court properly considered them as participants. *See, e.g.*, *United States v. Thomas*, 373 F. App'x 538, 540–41 (6th Cir. 2010) (upholding a leadership enhancement under § 3B1.1 based on eleven possible participants, including two with unknown last names); *United States v. Fells*, 920 F.2d 1179, 1182–83 (4th Cir. 1990) (holding that the district court properly considered individuals not identified by name (lower-level drug dealers) as participants for a leadership enhancement under § 3B1.1).

- 17 -

criminal activity meets the standard for criminal responsibility as a participant. *See* U.S.S.G. § 3B1.1 cmt. n.1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."). Considering this evidence, the district court didn't clearly err by finding Cortez-Diaz was a leader of criminal activity involving five or more participants.

*Failure to adequately explain the sentence.* "When a district court imposes a within-Guidelines sentence, the court must provide only a general statement of its reasons, and need not explicitly refer to either the [18 U.S.C.] § 3553(a) factors or respond to every argument for leniency that it rejects in arriving at a reasonable sentence." *Lente*, 647 F.3d at 1034 (internal quotation marks omitted). Cortez-Diaz argues that the district court failed to adequately explain the sentence and how it conformed to the § 3553(a) factors. Although he claims this is a substantive issue, we treat sentence explanation challenges as procedural. *United States v. Wilken*, 498 F.3d 1160, 1174 (10th Cir. 2007). And because he didn't object to the explanation below, we review for plain error.[13] *Id.*

Here, the district court expressly considered the § 3553(a) factors and the sentencing guidelines. As discussed above, the court also found and articulated several reasons for the base offense level and the enhancements imposed—all of which were supported by trial evidence or uncontested PSR statements. The district court further addressed Cortez-Diaz's request for a downward variance but denied the request based on the facts of the

---

[13] "Plain error occurs where there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Wilken*, 498 F.3d at 1174.

case, the PSR, and applicable law. In the end, the district court arrived at a within-Guidelines sentence, and we see no error, let alone plain error, in its explanation of how it got there.

## 2. Substantive Challenges

To determine a sentence's substantive reasonableness we consider its length given the case's circumstances and the § 3553(a) factors. *United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013). Cortez-Diaz attacks the substantive reasonableness of his sentence on two related grounds. First, he claims that his within-Guidelines sentence is unreasonable given the facts of this case and the § 3553(a) factors. Second, he argues that the Guidelines are driven by misguided policy that overemphasizes the quantity of methamphetamine in setting the base offense level.[14]

First, we may presume that within-Guidelines sentences are reasonable—and we do so here. *Peugh*, 133 S. Ct. at 2080. Despite Cortez-Diaz's arguments in favor of leniency, which the district court addressed, the court ultimately concluded that the specifics of the crime weighed in favor of the Guidelines recommendation. Considering our deferential standard on review and the well-supported facts found by the district court regarding the

---

[14] The government asks us to review the policy argument for plain error because Cortez-Diaz failed to object at sentencing. Although we would affirm the district court under either standard of review, we think Cortez-Diaz, although opaquely, raised this objection below allowing us to review for abuse of discretion.

amount of drugs involved, the use of the stash house, and Cortez-Diaz's leadership role, we find no abuse of discretion.[15]

Second, there is no doubt that a life sentence is a hefty penalty. But that is the Guidelines recommendation based on the policy that the Sentencing Commission saw fit to incorporate. Despite Cortez-Diaz's objection, "a sentence is not rendered unreasonable merely because of a district court's refusal to deviate from the advisory guideline range based on disagreements with the policies underlying a particular Guideline provision." *Wilken*, 498 F.3d at 1172 (internal quotation marks omitted). The district court was well within its discretion to rely on the Guidelines recommendation here, notwithstanding Cortez-Diaz's challenges to the policies underlying that recommendation.

CONCLUSION

We conclude that the sentence was procedurally and substantively reasonable and therefore affirm.

Entered for the Court

Gregory A. Phillips
Circuit Judge

---

[15] Cortez-Diaz faults the district court for its "blind reliance" on the quantity of drugs. *See* Apellant's Br. 40. Even excluding the stash-house drugs, however, Cortez-Diaz's base offense level still would be 36. U.S.S.G. § 2D1.1(c)(2). With the two enhancements, his total offense level would be 42, resulting in an advisory sentencing range of 360 months to life imprisonment. The district court's sentence would thus still fall within the applicable Guidelines range.